**Baby girl SAMPSON, by Parent, Janet D. Sampson, Appellant,**

**v.**

**Ralph G. HOLTON and Marlene Holton, Appellees.**

**No. 54263.**

Supreme Court of Iowa.

March 11, 1971.

Rehearing Denied May 3, 1971.

Robert C. Oberbillig and Vivian Jury Lawyer, Des Moines, for appellant.

Paul E. Huscher, Des Moines, for appellee.

UHLENHOPP, Justice.

In this appeal we consider the propriety of a decree in a habeas corpus proceeding awarding custody of an infant to a couple who desire to adopt the child.

Janet D. Sampson, whom we will call plaintiff, was formerly married to Earl Sampson. They had four children and lived in South Dakota. Mr. Sampson obtained a divorce there from plaintiff on February 20, 1968. Plaintiff was granted custody of the children. At time of the present trial, plaintiff was 27 and the four children ranged in age from nine down to three. After the divorce, plaintiff received some child support from Sampson, earned some wages, and obtained some public as-

sistance from South Dakota under the program of Aid to Dependent Children.

In October of 1968, plaintiff and the children came to Des Moines, Iowa. Soon afterward she became pregnant by a man who was an alcoholic. She did not tell her former husband in South Dakota about her condition and evidently feared to do so. She and the children lived in a trailer in Des Moines and subsisted on child support, wages, and ADC from South Dakota. The trailer leaked and was infested with cockroaches, the plumbing did not function, and the furnace did not work well.

In March of 1969, plaintiff consulted a physician about her condition. She thought she should not marry the father of the unborn child because of the alcoholism problem, and she asked the physician about "adopting the baby out." The physician told her he thought that would be possible and inquired briefly about the father of the child so that he could inform prospective adoptive parents. He told plaintiff that adoptive parents are usually willing to pay the confinement expenses.

Plaintiff saw the physician again several times during her pregnancy. Adoption was not discussed further until a few weeks prior to plaintiff's confinement. Plaintiff then asked if arrangements for adoption had been made and the physician told her not to worry and assured her the matter would be taken care of. She said she did not want to see the child.

As time for confinement approached, plaintiff's finances became more straitened. She could not hold a job because of her condition. South Dakota discontinued ADC; she would have to return there to receive that assistance.

Plaintiff could not pay the rent on the trailer for August of 1969. About August 19th the landlord told her to get out, took her radio and television sets to apply on the rent, and said he was going to pull out the trailer with her belongings in it. She and the children slept in the trailer that night. The next day, Wednesday, she piled her belongings into her car, took the children to a neighbor, unsuccessfully searched for another place to live, and commenced labor.

She entered a hospital, the physician came, and she was delivered of a baby girl, the subject of this suit. She did not see the child. In the delivery room she asked the physician about the sex of the child and he parried the question by suggesting she think about the matter.

That was Wednesday evening. Plaintiff remained in the hospital on Thursday. On Friday morning she was discharged. At the physician's instance, a nurse asked plaintiff at that time to sign a letter directed to the hospital authorizing it to surrender the child to the physician upon request, after the hospital had obtained medical permission for release of the child. Plaintiff read the letter, signed it, and left the hospital. The child remained.

Meantime the physician learned that defendants desired to adopt a child. Defendants live on a farm they own, and defendant Ralph G. Holton has a good job off the farm. The physician checked with two other physicians who knew defendants and learned that defendants are good people, have a good home, and would make good parents.

On Sunday, August 24th, the child was released from the hospital and was surrendered to the physician, who in turn placed the child with defendants. They soon took counsel concerning adoption proceedings, and their attorney contacted plaintiff about signing consent to adoption of the child by defendants.

When plaintiff left the hospital on Friday, August 22nd, she was in a very difficult situation. She gathered her other children together and drove to Pierre, South Dakota, where her relatives and former husband were. She was there on Saturday and the following several days.

We are not clear what plaintiff's actual intent was regarding the child. Either she never really intended to have the child adopted, or she changed her mind. She did not want to tell her former husband about the pregnancy, perhaps fearing loss of child support, but she did tell him that Saturday when she returned to South Dakota. He accepted the fact and even talked about remarriage with inclusion of the new child in the family. This may explain plaintiff's seeming change of mind.

In any event, very shortly plaintiff consulted an attorney in South Dakota about getting the child. By telephone, she contacted the Polk County Legal Aid Society also. Legal Aid advised plaintiff she would have to return to Des Moines. She obtained a job, got a little money together in order to travel, returned to Des Moines in about a week and a half, contacted Legal Aid, and petitioned for the present writ.

The district court promptly set the case down and held trial on September 19, 1969, when the child was 30 days old. After hearing the evidence, the trial court quashed the writ, granted defendants custody, and denied plaintiff visitation. Hence this appeal by plaintiff.

■ Defendants approach the case from the standpoint of abandonment of the child by plaintiff. We do not say that issue would never be involved in a case like this. But we do not get to that issue in the present case, for we think at this early stage of an unconsummated adoption the policies enunciated in the adoption statute are determinative.

This is not a case in which, for example, a parent leaves a child with grandparents for a prolonged period and the courts subsequently refuse to return the child to the parent, as in Pelton v. Halverson, 240 Iowa 184, 35 N.W.2d 759. Custody is only collaterally involved here; if defendants can get custody because of abandonment, they can endeavor to adopt the child without plaintiff's consent under such cases as

Jensen v. Sorenson, 211 Iowa 354, 233 N. W. 717. Defendants were trying at the time to adopt this child and the case was tried less than a month after they received the child into their hands. We think the adoption law is the relevant law.

Adoption deals with the parent-child relationship, the termination of that relationship between certain individuals and the child and the creation of it between other individuals and the child. Adoption is the creation of statute. In re Estate of Williamson, 205 Iowa 772, 218 N.W. 469.

In late years the legislature has tightened up the manner in which rights and obligations regarding children can be transferred. It has provided in the first sentence of the adoption statute that "no person other than the parent of a child may assume the permanent care and custody of a child under fourteen years of age except in accordance with the provisions of this chapter or chapter 238." Code, 1971, § 600.1. Chapter 238, regulating child-placing agencies, provides in § 238.26, "No person may assign, relinquish, or otherwise transfer to another his rights, or duties with respect to the permanent care or custody of a child under fourteen years of age unless specifically authorized or required so to do by an order or decree of court, or unless the parent or parents sign a written release attested by two witnesses, of the permanent care and custody of the child to an agency licensed by the state director [of the division of child and family services]."

Section 600.3 of the adoption statute relates to consent to adoption. The section provides in part:

The consent shall be in writing and verified and a copy shall be attached to the petition. The consent shall refer to and be applicable only to the specific adoption proposed by such petition.

■ Thus the policy established by the legislature in this state is that permanent rights and obligations regarding the children mentioned can only be transferred by

court decree, by compliance with the statute on child-placing agencies, or by adoption. Now what do we have here?

 Defendants did not obtain this child by court decree. The physician is not a licensed child-placing agency, and if he were, he did not acquire the child in the manner required by § 238.26. Defendants did not obtain plaintiff's consent to adoption, nor did they adopt the child. Under the statutes quoted relating to transfer of rights and responsibilities regarding children, the rights and responsibilities regarding this child have not been transferred—unless we cut across the statutes.

We cannot cut across the statutes. The rules have been laid down by the legislature, and we must give them effect. The court has spoken clearly in this area of law. Attempts have been made to use "blanket consents" to adoption and to claim the mother waived the requirement that a consent refer to a specific adoption. Of that the court has said, "We hold that section 600.3 lays down a definite rule which must be followed in adoption cases, no matter how desirable it may appear to be under some circumstances that it be circumvented." In re Adoption of a Baby Girl, 248 Iowa 619, 627, 80 N.W.2d 500, 505. The court has said that the "safeguards and provisions" regarding investigations of adoptions, except where they may be and are waived by the court, "require the most careful observance." In re Adoption of Cheney, 244 Iowa 1180, 1189, 59 N.W.2d 685, 690. Regarding the adoption provisions as a whole, the court has said that "a failure to follow them in any material respect is fatal to the power of the court to decree an adoption." In re Adoption of a Baby Girl, supra, 248 Iowa at 624, 80 N. W.2d at 503.

We realize that this physician acted in good faith and thought he was doing the right thing for the child. We are sure that defendants are upstanding people and would do well for the child. We appreciate that numerous adoptions probably proceed without the intervention of a child-placing agency and counseling of the mother or without an executed adoption consent before the child is placed in the adoptive home—and that many of those adoptions are completed satisfactorily. But the participants in such cases are playing with fire. The contemplated adoption may abort before consummation, as this one did, with grief to all concerned.

Courts cannot decide cases like this one on the basis of grief. If adopters could successfully contend that a nonconsenting mother abandoned her child so that her consent to adoption is not required, though she sought her child within a month, the consent statute would be circumvented and the legislature requirement of a specific written consent to every adoption would be frustrated.

The statutes regulating the transfer of permanent rights and responsibilities with respect to children constitute an enlightened effort by the legislature to protect the interests of the child, the natural parents, and the adopters. Careful compliance with those statutes will reduce the incidence of unfortunate situations like this one.

Reversed.

All Justices concur except LARSON, J., who takes no part.